In re Anonymous No. 41 D.B. 79 and 42 D.B. 79

Disciplinary Board Docket no. 41 D.B. 79 and 42 D.B. 79.

ELLIOTT, *Board Member,* April 7, 1981— Pursuant to Pa.R.D.E. 208(d), the Disciplinary Board of the Supreme Court of Pennsylvania (board) submits its findings and recommendations to your honorable court with respect to the above-captioned petitions for discipline.

## I. HISTORY OF PROCEEDINGS

On December 12, 1979, the Office of Disciplinary Counsel charged attorneys respondent no. 1 and respondent no. 2 with the acts of misconduct arising out of their participation in two bribery schemes. Charge I was based upon a proposed $800,000 pay-off to a local party organization by a client of respondents seeking to construct an industrial facility in the locality. Charge II was based upon a $4,000 bribe to procure the placement of client's mother into a publicly operated nursing

home. The hearing committee found no disciplinary violations with respect to Charge I and found violations of D.R. 1-102(A)(5), D.R. 7-102(A)(7) and D.R. 7-102(A)(8) with respect to Charge II. The hearing committee recommended that both respondents receive a public censure.

The Office of Disciplinary Counsel excepted to the findings and conclusions of the hearing committee. Disciplinary Counsel has urged that this board find violations of various disciplinary rules relating to Charge I and recommend more severe discipline upon respondents. The case was briefed and argued by all parties.

## II. STATEMENT OF FACTS

### A. Charge I

Both respondents are attorneys admitted to the practice of law in the Commonwealth of Pennsylvania and during the times material hereto, engaged in a law partnership in [ ] County, Pa. Respondents represented [ ] Energy Company which was seeking to construct a substitute natural gas plant in [ ] County.

Early in 1973, respondent had several conversations with [A], Chairman of the [ ] Republican Party concerning the Energy project. During this period, respondents had a fee arrangement with Energy for $50 per hour of work performed. [A] noted that because of local opposition to the Energy project, the local leadership wanted to be sure that they would receive something in return if they supported the Energy Plant. [A] suggested to respondent that respondents receive a large legal fee from Energy which would not be retained by respondents but rather paid out as directed by [A] for local political events. [A] suggested that the large fee consist

of one percent of the construction cost for the plant, or about $800,000, contingent upon Energy getting all of the necessary permits and approvals. While respondents were holding the money paid by Energy the law firm was to keep the interest earned on the fund. Respondent no. 1 had numerous contacts with [A] to discuss this plan, including one meeting at respondent no. 1's office.

On March 30, 1973, respondent no. 1 sent a letter to [B], an attorney employed by Energy, in which he set forth the terms of the "contingent fee" arrangement. Respondent no. 1 admitted that the letter was not what it purported to be, a confirmation of a fee agreement, but rather that it was a means of communicating to [B] the terms of the proposed deal with [A]. But the March 30 letter was *also,* quite obviously, a substantial step toward the consummation of this illegal arrangement. It was the beginning of a documentary cover up which was necessary to hide the reality of the proposed Energy payment. The record, taken as a whole, indicates that if the scheme had not been called off by Energy, respondent no. 1 was prepared to proceed in accordance with the terms of his March 30, 1973 letter and [A's] proposal.

The evidence also indicates that respondent no. 2, was not an innocent bystander in this transaction but rather actively participated in the implementing dialogue. Respondent no. 2 was present at the meeting with [A] in respondent no. 1's office. Respondent no. 2 analyzed the tax consequences to the law firm of receiving a payment of this magnitude. Respondent no. 2 even suggested that payments out of the fund should not exceed $10,000 at a time so that the bank would not report the withdrawal to the IRS. He calculated the amount of interest income for the firm and suggested incur-

ring high office expenses, including the leasing of expensive cars, in order to minimize the tax burden. Finally, respondent no. 2 reviewed the March 30, 1973 letter and approved of it before it was mailed to Energy. The record clearly indicates that respondent no. 2 stood to benefit from the transaction personally, through the income accruing to the firm, and took no action to stop or even discourage the payment from Energy.

## B. Charge II

In July of 1973, [C] a client of respondent no. 2, approached respondent no. 2 concerning the placement of his mother in a public nursing home. Respondent no. 2 told [C] that he would consult with respondent no. 1 and that respondent no. 1 might be able to assist in having [C's] mother placed because of respondent no. 1's political position. Respondent no. 2 told respondent no. 1 of [C's] request, which respondent no. 1 relayed to [A]. [A] suggested to respondent no. 1 that if the woman or her family made a $4,000 contribution to the local political party that he would "speed up" her admission to the county home. Respondent no. 1 relayed this advice to respondent no. 2.

Respondent no. 2 then discussed the matter with his client, [C]. Respondent no. 2 told [C] that he thought that the figure was excessive but that the decision was up to [C] and that respondent no. 2 would help him if [C] wanted to go through with it. Shortly thereafter, [C] tendered $4,000 in cash to respondent no. 2 which he counted and passed along to respondent no. 1. Respondent no. 1 gave the cash to [A]. [C's] mother was then admitted to the nursing home very expeditiously.

## III. DISCUSSION

With respect to Charge I, the board is compelled to reject the hearing committee's assessment of the facts and the ethical obligations of the participants. There are two highly signficant conclusions of the committee which, taken together, give rise to general misapprehension of the heart of the Energy affair.

First, the hearing committee concluded that respondent no. 1's communications with Energy concerning the proposed bribe did not amount to the violation of any disciplinary rule. (Hearing committee report at 12-13, hereinafter Rep.). Had respondent no. 1 merely reported [A's] offer to Energy, the hearing committee's conclusion may be apt. But the March 30, 1973 letter (P-7) was far more than a factual report. It was a positive step toward effectuating the illegal scheme. It was the first and fundamental document necessary to conceal the true nature of the payment.

Respondent no. 1's explanation of the March 30, 1973 letter as a report of the facts "in code" is strained. There were certainly easier and more effective ways of communicating the facts including a simple phone call. Respondent no. 1 actually discussed the facts with Energy's in-house counsel, [B], by telephone, before the letter was received. The necessity of the letter as a mere, coded communication of the facts in light of this virtually contemporaneous phone call is far from apparent. Secondly, even if the letter was a coded communication, that fact in no way diminishes its obvious and primary purpose as the foundation of the deception by which the illegal payment would be made.

The second erroneous conclusion reached by the hearing committee was that no deception was involved here because the client knew that the March 30 letter was a "fake." (Rep. at 14). There are others who can be deceived besides the client. Had the scheme gone forward, Energy would have been actively involved. The intent of the scheme was never to deceive Energy but rather to deceive the public and law enforcement officials. Such deception, particularly when the public trust is involved, is just as odius and reprehensible as the deception of a client.

The involvement in this scheme by respondent no. 1 aided, and abetted by respondent no. 2, had sufficiently advanced to a point where, if crimes were not committed, disciplinary rules certainly were violated. The board finds violations of D.R. 1-102(A)(4), (5) and (6). D.R. 1-102(A)(4) is not limited to fraud or deception of a client. As previously discussed, the procurement of a governmental decision by an improper and concealed payment is a fraud on the public. The March 30, 1973 letter was a deception; it was intended to be a misrepresentation for the purpose of deceiving anyone who subsequently examined the transaction. The participation in the planning and effectuation of this scheme by respondents was clearly prejudicial to the administration of justice. The fact that neither one made an effort to stop the scheme but rather demonstrated a willingness to promote it constitutes conduct which adversely reflects on their fitness to practice law.

Because the March 30 letter was itself an intentionally and knowingly false statement of the facts of either respondents' current or future fee arrangement and a positive step toward an illegal and

fraudulent course of conduct; the board also finds a violation of D.R. 7-102(A)(5) and (7). The board finds no violation of the D.R. 9-101(c) on this record.

With respect to Charge II, the board agrees with the hearing committee that respondents may have violated the Crimes Code, 18 Pa.C.S.A. 4701, making bribery a felony of the third degree, but that question is neither before the board nor necessary to a finding of a disciplinary violation. The board notes, however, that no attempt to conceal or disguise the bribe is apparent from the record and that respondents acted with at least a limited good motive, to secure the admission of an elderly and infirm woman into a public nursing home. Nonetheless, the conduct of respondents was designed and intended to procure a governmental decision by means of an improper payment and may well have impeded the ability of more needy patients, who were unable to make a "contribution," to gain admission to the nursing home.

On these facts, the board finds violations of D.R. 1-102(A)(4) since the payment defrauded the public, of D.R. 1-102(A)(5) since the arrangement of bribes is patently prejudicial to the administration of justice and of D.R. 1-102(A)(6) since such improper conduct involving governmental decision-making, with which lawyers are involved on a daily basis, reflects adversely of respondents' fitness to practice law. Finally, the board finds violations of D.R. 7-102(A)(7) and (8) since both respondents knowingly assisted respondent no. 2's client in making a bribe, Without in any way lessening the seriousness of these offenses, the board agrees with the hearing committee that the facts of the Charge II bribe do not constitute illegal conduct which also

involves moral turpitude and therefore finds no violation of D.R. 1-102(A)(3).

The board has considered that both respondents have cooperated with law enforcement authorities in connection with the prosecution of [A]. While such cooperation is laudable, it also involves an element of self-interest in lessening their respective criminal exposures, even where testimony is given without formal immunity. Respondents' cooperation clearly does not change the facts of their disciplinary violations and the board concludes that it should not affect the appropriate disciplinary recommendation in this case.

## IV. RECOMMENDATION

The board respectfully recommends to your honorable court that respondents be suspended from the practice of law for a period of one year.

Messrs. Johnson, Pearlstine and Schiavo did not participate in the adjudication.

## ORDER [of Pennsylvania Supreme Court]

PER CURIAM, December 23, 1981—The rule to show cause is discharged and respondents are suspended from the practice of law for three years from the date of the original suspension.

Mr. Justice Larsen, Mr. Justice Flaherty, and Mr. Justice Kauffman dissent and would disbar respondent no. 1 and would suspend respondent no. 2 for two years.